CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 05 2014

JULIA ~~C. DUDLEY~~, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| HAZEL K. FARIS, EXECUTOR OF THE ESTATE OF GEAT REX FARIS ) ) ) Plaintiff, ) ) v. ) ) UNITED STATES OF AMERICA ) ) ) Defendant. ) | Civil Action No. 7:13cv168 **MEMORANDUM OPINION** By: Samuel G. Wilson United States District Judge |

This is an action by Hazel Faris, executor of the estate of Geat Faris ("Faris"), against the United States of America (the "Government"), pursuant to the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. § 2671, *et seq.*, alleging medical malpractice by medical personnel who were treating Faris' prostate cancer at the Veterans Affairs Medical Center ("VAMC") in Salem, Virginia. The Government has moved to dismiss Faris' complaint or for summary judgment on two grounds. First, the Government argues that Faris' did not timely file his administrative claim with the United States Department of Veterans Affairs, a jurisdictional prerequisite to suit. Second, the Government argues that irrespective of timeliness, the court nonetheless lacks subject matter jurisdiction as to claims arising from the actions of the alleged negligence of his treating physician, Dr. Anibal Medina, because Dr. Medina is an independent contractor, and the FTCA does not waive sovereign immunity for the acts of independent contractors. The court finds that Faris filed his administrative claim in a timely manner but dismisses claims arising from the alleged negligence of Dr. Medina, whom the court concludes was an independent contractor.

I.

On November 2, 2000, Dr. Medina diagnosed Faris with non-advanced, localized prostate cancer and discussed four treatment options with him: monitoring the condition, hormone therapy, radiation therapy, and surgery. Faris consulted with another doctor at the VAMC who reiterated those options, and Faris eventually opted for hormone therapy. According to Faris, the doctors led him to believe that hormone therapy was potentially curative, which in fact it is not. Over the next eight years, Faris received hormone therapy at the VAMC with apparent success. For the most part, Faris' prostate-specific antigen (PSA) levels responded positively to the treatment,[1] permitting Faris to receive fewer treatments and even to discontinue treatment altogether at various times.

In June 2008, after the VAMC lost its urology department, Faris became disgruntled with the VAMC and sought additional care from outside physicians. (ECF No. 23 at 51-52) On July 21, 2008, Faris visited Dr. Kareem Zaki,[2] who reviewed Faris' diagnosis and treatment history. Dr. Zaki told Faris he wished "[Faris] had made a different decision [eight] years [earlier] and proceeded with a more aggressive treatment modality" but found no reason to revisit the decision and recommended its resumption. (Id. at 54-55) Dr. Zaki ordered a CT scan and bone scan, as well as a PSA test. Id. at 55. The results of the CT scan and bone scan were negative, showing that the cancer had not spread, and Faris' PSA level was 0.7. (Id. at 57-58) In light of these results, Faris chose not to resume hormone therapy. Dr. Zaki believed Faris' choice reasonable

---

[1] "The PSA test measures the blood level of PSA, a protein that is produced by the prostate gland. The higher a man's PSA level, the more likely it is that he has prostate cancer. However, there are additional reasons for having an elevated PSA level." "Prostate-Specific Antigen (PSA) Test." *National Cancer Institute*, http://www.cancer.gov/cancertopics/factsheet/detection/PSA (last viewed February 27, 2014).

[2] On June 9, 2008, Faris also saw Dr. Steven Huff, but Dr. Huff referred him to Dr. Zaki. (ECF No. 23 at 51-52)

because Faris appeared "asymptomatic." (Id. at 57) Four months later, Faris' PSA levels dropped to 0.5 (as of January 5, 2009). (Id. at 61) However, beginning in mid-2009, the VAMC noted that Faris' PSA levels began to fluctuate. Faris resumed his hormone therapy, and his PSA levels again decreased. Then, in 2010, Faris' PSA levels appeared to become less responsive to the hormone therapy, as Faris' PSA levels gradually increased. (See id. at 104)

Because Faris had received hormone therapy intermittently for approximately ten years, the VAMC asked if he would be interested in participating in a clinical study on the side-effects of hormone therapy. Faris agreed, and the VAMC scheduled a CT scan and PSA test for September 2010. However, because Faris was having difficulty urinating, in July 2010, Dr. Zaki removed part of Faris' prostate.[3] Then, on August 19, 2010, Faris consulted another outside physician who discussed with Faris the "vagaries and inconsistencies of prostate cancer diagnosis and treatment." (Id. at 99)

On September 20, 2010, Faris had the clinical study CT scan. That scan revealed that Faris' cancer had metastasized. The reviewing physician did not inform Faris that his cancer had metastasized but referred him to a radiation oncologist. On September 28, 2010, the oncologist, Dr. Robert Heath, informed Faris that his prostate cancer had become "hormone refractory," meaning that hormones could no longer prevent the growth or spread of the cancer, and that this often occurs if given enough time. As a result, Faris' "15-year survival rate" had dropped significantly from 80 percent to less than 40 percent. Though Dr. Heath did not inform Faris that his cancer had metastasized, he recommended that Faris have radiation therapy. (Faris' Dep. 24:6-26:24) Faris began radiation therapy, which continued until March 2011, when a physician

---

[3] Faris had another illness for which he took an unrelated medication that also caused urinary side effects. (Id. at 98)

3

told Faris that his September 20, 2010 CT scan had actually also revealed metastasis of his cancer and that Faris should have been receiving chemotherapy. (Faris' Dep. 28:9-29:15) On learning this news, Faris switched from radiation treatment to chemotherapy.

On August 17, 2012, Faris filed an administrative claim with the United States Department of Veterans Affairs, alleging medical malpractice by the VAMC medical personnel. The claim was denied on February 14, 2013. Faris died on March 4, 2013. Approximately one month later, the executor of Faris' estate filed suit in this court under the FTCA, again alleging medical malpractice by Dr. Medina and other VAMC medical personnel on the grounds that they improperly advised Faris that hormone therapy was an appropriate treatment that could cure Faris' cancer and departed from the standard of care in providing that treatment.

The Government has moved to dismiss pursuant to Rule 12(b)(1). It argues that it is immune from liability because Faris failed to file his administrative claim with the United States Department of Veterans Affairs within two years after Faris' claim accrued. Irrespective of the timeliness of the filing, the Government also argues that it is immune from suit for claims arising from Dr. Medina's negligence because he was an independent contractor and not a Government employee. Faris filed a motion to compel discovery in order to respond to the Government's motion. The court held a hearing and granted Faris' motion. After the parties completed discovery, the Government moved for summary judgment on the estate's claim arising out of Dr. Medina's course of treatment and, in support of its motion, submitted numerous declarations and exhibits. Faris responded.

According to the undisputed evidence, Dr. Medina began working at the VAMC in late 2000 under a contract with CompHealth to provide medical services to its clients as needed.

CompHealth is a medical staffing company that helps place medical professionals. CompHealth, in turn, contracted with the VAMC to provide Dr. Medina's professional services to the VMAC hospital. The VAMC-CompHealth contract stated: "It is expressly agreed and understood that this is a non-personal services contract as defined in Federal Acquisition Regulation (FAR) 37.101,[4] under which the professional services rendered by the Contractor or its health care providers are rendered in its capacity as an independent contractor." (ECF No. 31-1 at 3) According to that contract's express provisions, the Government would have "no control over the professional aspects of the services rendered, including, by example, the Contractor's or its health care providers' professional medical judgment, diagnosis or specific medical treatments." (Id.) The Medina-CompHealth contract provided similarly that Dr. Medina would provide services on a "locum tenens" (temporary) basis and would perform those services "as an independent contractor" while "exercis[ing] independent judgment and control over [his] schedule, patients, and professional services as long as [he] meet[s] the requirements of the facility where [he] work[ed]." (ECF No. 16-6 at 3)

In order to meet the VAMC's need for a physician certified in urological surgery, the VAMC required that the physician supplied from CompHealth conduct weekly outpatient and inpatient clinics on Monday, Tuesday, and Thursday, as well as surgical procedures on Monday, Wednesday, and Friday. (Medina's Dep. 14:9-17:2) The physician was also required to remain on-call in the event of an emergency and to abide by all hospital by-laws and any applicable state or federal requirements. (Id.) However, despite these requirements, that physician maintained the right to work for other facilities unrelated to the VAMC and the "right to delegate any of

---

[4] Federal Acquisition Regulation 37.101 defines a "non-personal service contract" as "a contract under which the personnel rendering the services are not subject, either by the contract's terms or by the manner of its administration, to the supervision and control usually prevailing in relationships between the United States and its employees." 48 C.F.R. § 37.101.

5

[his] obligations under [the CompHealth] agreement to an equally qualified physician with the prior consent of CompHealth and [its] client." (ECF No. 16-6 at 3)

CompHealth, not the VAMC, paid Dr. Medina based on work actually performed (an hourly rate rather than a salary). Neither the VAMC nor CompHealth withheld any of the doctor's taxes. (ECF 16-6; 31-1; 31-2) CompHealth paid for medical malpractice liability insurance, but Dr. Medina was responsible for his own worker's compensation benefits, unemployment insurance, health insurance, and retirement plans. (Id.)

II.

The Government has moved to dismiss and for summary judgment on the ground that Faris did not file his administrative claim with the United States Department of Veterans Affairs within two years after it accrued, a jurisdictional prerequisite to suit under the FTCA. However, because a medical malpractice claim under the FTCA does not accrue until plaintiff knows or should know *both* the existence of his injury and its cause, and because Faris filed his administrative claim within two years of the date he knew or should have known that his cancer had worsened *and* that his condition was attributable to the treatment of Government medical personnel, the court denies the Government's motion.[5]

---

[5] Because compliance with the FTCA statute of limitations is a jurisdictional prerequisite, it is properly analyzed as a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). A motion to dismiss for lack of subject matter jurisdiction may attack either the sufficiency of the allegations in the complaint (a "facial attack") or the existence of subject matter jurisdiction in fact (a "factual attack"). See Thigpen v. United States, 800 F.2d 393, 401 n.15 (4th Cir. 1986). When a "factual attack" is made—as the Government does here—the court must determine whether the jurisdictional issue is separable from the merits of the case. If they are separable, the court may consider evidence outside the pleadings and in an evidentiary hearing decide for itself the disputed jurisdictional facts, with the plaintiff bearing the burden of persuasion. See Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009). However, "where the jurisdictional facts are intertwined with the facts central to the merits of the dispute . . . [the] trial court should then afford the plaintiff the procedural safeguards—such as discovery—that would

6

The FTCA requires that plaintiffs alleging tort claims against the federal government file an administrative claim with the relevant agency within two years after the claim accrues or "be forever barred." 28 U.S.C. § 2401(b). "Although FTCA liability is determined 'in accordance with the law of the place where the act or omission occurred,' federal law determines when a claim accrues." Gould v. U.S. Dep't of Health & Human Servs., 905 F.2d 738, 742 (4th Cir. 1990) (en banc) (citing 28 U.S.C. § 1346(b)). In United States v. Kubrick, 444 U.S. 111 (1979), the Supreme Court determined that an FTCA medical malpractice claim accrues when the plaintiff discovers both the existence of an injury and its cause. Id. at 123–25. The Kubrick FTCA accrual test focuses on a plaintiff's knowledge of facts. A plaintiff must have enough crucial facts such that he knows, or should know, that he has suffered a harm and that his medical provider caused that harm so that he may protect himself by seeking legal advice. A.Q.C. ex rel. Castillo v. United States, 715 F. Supp. 2d 452, 458 (S.D.N.Y. 2010) aff'd, 656 F.3d 135 (2d Cir. 2011).

Here, Faris' estate alleges that VAMC medical personnel negligently misadvised Faris concerning the appropriateness and efficacy of hormone therapy given Faris' age and condition and that the resulting course of treatment caused his injury and premature death. The evidence shows, however, that the initial advice and treatment plan did not inflict an immediate harm.

---

apply were the plaintiff facing a direct attack on the merits." Id. at 193. "[A] presumption of truthfulness should attach to the plaintiff's allegations." Id. And "the moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983). In this case, the jurisdictional question of accrual cannot be separated from the merits. To determine the date of accrual, the court must assess when Faris knew or should have known that the Government medical personnel's conduct led to his worsened state. This, in turn, requires the court to consider whether the attending personnel properly diagnosed the original condition, adequately informed the patient of the need for treatment, recommended appropriate options given the diagnosis, and provided sufficient care. Resolution of these facts goes to the "heart" of Faris' negligence claim under the FTCA. Therefore, the court will apply summary judgment standards with respect to the Government's motion to dismiss.

Faris did not suffer an injury until his pre-existing cancer developed into a more serious condition, and that did not occur until his cancer became "hormone refractory,"[6] which is a progression of the disease to an advanced form that affects survival rate and treatment options.[7] Before that time, Faris' cancer remained in substantially the same state as when Dr. Medina first diagnosed him, i.e., locally non-advanced and highly treatable. Accordingly, Faris' cause of action did not accrue until he knew or should have known that his cancer had worsened *and* that it was attributable to the treatment he received. At the earliest, that occurred on September 28, 2010 when Dr. Heath in oncology informed Faris that Faris had developed hormone refractory disease *as a result of* outliving the effectiveness of hormone therapy. At that moment, Faris first realized that hormone therapy does not cure prostate cancer but only "controls" the disease for an unknown time period, and thus, he was not suffering from correctable complications or the "vagaries" of treatment. Rather, he was suffering an actual harm from the allegedly negligent selection years earlier of an inappropriate treatment modality for a man of his condition and age at that time.[8] (Faris' Dep. 26:2-5)

Nonetheless, the Government argues that Faris' cause of action accrued much earlier because Faris should have inquired further after he consulted Dr. Zaki, an outside physician, on

---

[6] It may be argued that the injury occurred when the prostate cancer spread *beyond* the prostate, i.e., metastasized, and not merely when it became a locally advanced disease. Regardless, the date when Faris knew or *should have known* that he had suffered such an injury and that the VAMC was its cause would be the same (September 28, 2010).

[7] See also Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983) (Where a claim of medical malpractice is based on the failure to . . . treat a pre-existing condition, the injury is not . . . the mere continuance of that same undiagnosed problem in substantially the same state. Rather, the injury is the *development* of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment.) (emphasis in original).

[8] There is evidence in Faris' medical records to suggest that he may have been aware that his cancer was hormone refractory when Dr. Zaki performed surgery. (See ECF No. 23 at 97) (Dr. Zaki's notes diagnosed his cancer as "hormone refractory.") Notwithstanding, the Government has marshaled no evidence indicating that any doctor explained this to Faris, what it meant, or its *cause*. See also Note 9.

8

July 21, 2008.[9] However, there is no evidence that Faris' cancer had appreciably worsened at that time. In fact, Faris' test results indicated the exact opposite. Both the new CT scan and bone scans ordered by Dr. Zaki were negative (indicating that the cancer had not spread into the bone or nearby lymph nodes), and Faris' PSA levels remained low, leading Dr. Zaki to conclude that Faris was actually "asymptomatic." (ECF No. 23 at 57) (PSA level of 0.7 on September 4, 2008 and 0.5 on January 5, 2009).[10] Therefore, because Faris' prostate cancer remained locally non-advanced and curable, his cause of action did not accrue when he met with Dr. Zaki.[11] Rather, Faris' cause of action accrued on September 28, 2010 when Faris had both suffered an injury and learned sufficient facts to indicate that VAMC personnel had caused that harm.

Accordingly, because Faris filed an administrative claim on August 17, 2012 (within two years of the date Faris' cause of action accrued), his estate has satisfied the FTCA's timely claim filing requirement, and the court will deny the Government's motion to dismiss for untimeliness.

---

[9] The Government also argues that fluctuating PSA levels from late 2009 to mid-2010 and the need for a procedure to help him urinate should have indicated to Faris that his condition was worsening and that it was due to inadequate treatment by the government. However, the Government's argument misconstrues the "should have reasonably known" standard. The standard "looks not to the likelihood that a plaintiff would in fact have discovered the cause of his injury if he had only inquired, but instead focuses on whether the plaintiff could reasonably have been expected to make the inquiry in the first place." Rosales v. United States, 824 F.2d 799, 804 (9th Cir. 1987). Because "[p]atients may reasonably rely on assurances by physicians that complications are normal and do not indicate that an actual injury has occurred," it cannot be said that a reasonable person in Faris' position would have inquired whether his PSA levels or his need for surgery indicated that he had suffered an injury due to the treatment that his doctors recommended. Id. In fact, as one of Faris' doctors noted shortly after his surgery, the treatment of prostate cancer can be unpredictable.

[10] Faris' PSA levels even continued to drop from that point despite being off hormone therapy at that time. (ECF No. 23 at 57, 60) (PSA level of 0.5 on January 12, 2009).

[11] The Government cites an unpublished Fourth Circuit decision, Hahn v. United States, 313 F. App'x 582 (4th Cir. 2008), for the proposition that Faris' claim accrued when he consulted an outside physician who stated that he wished he had chosen a more aggressive treatment plan. But, unlike here, in Hahn, the plaintiff had already suffered an injury when he contacted the outside physicians. Moreover, the outside physician in this case did not give any indication that Faris may have received inadequate treatment, only that he wished Faris had chosen another option.

9

III.

The Government also has moved to dismiss and for summary judgment as to the estate's claims arising out of the alleged negligence of Dr. Medina on the grounds that he was an independent contractor and not a VAMC employee because the Government did not have meaningful control that is indicative of an employer-employee relationship. The court agrees and finds that the relationship between the VAMC and Dr. Medina bore none of the hallmarks of an employer-employee relationship. Accordingly, the court grants the Government's motion to dismiss Faris' FTCA claims arising out of that relationship.[12]

"The FTCA contains a limited waiver of the United States' sovereign immunity, allowing a plaintiff to sue the United States for damages in compensation for injuries resulting from certain torts of employees of the government acting within the scope of their employment." Robb v. United States, 80 F.3d 884, 887 (4th Cir. 1996) (citing U.S.C. § 1346(b)). By its very terms, the waiver applies only to the acts of government employees and explicitly eliminates from government liability the tortious acts of independent contractors. See Wood v. Standard Products Co., Inc., 671 F.2d 825, 829 (4th Cir. 1982). Whether an individual is a government employee or an independent contractor under the Act is a question of federal law. Logue v. United States,

---

[12] The parties have submitted the issue for a decision based on depositions and exhibits without requesting an evidentiary hearing. The court considers the issue under Rule 12(b)(1) because if Dr. Medina is an independent contractor and not a government employee, then, the United States has not waived its immunity with respect to claims based on his conduct and is not subject to suit in this court. Kramer v. United States, 843 F. Supp. 1066, 1068 (E.D. Va. 1994); Robb v. United States, 80 F.3d 884, 887 (4th Cir. 1996); see also Williams v. United States, 50 F.3d 299, 304-05 (4th Cir. 1995) (holding that the district court should have dismissed for want of jurisdiction under Rule 12(b)(1) rather than granting summary judgment when the government did not waive its immunity under the FTCA). Even though the court will grant the Government's motion to dismiss under Rule 12(b)(1), the court has afforded Faris the benefit of all of the procedural protections of a motion for summary judgment. See Lufti v. United States, No. 11-1966, 2013 WL 1749526, at 4-6 (4th Cir. April 24, 2013) (citing Kerns v. United States, 585 F.3d 187, 195 (4th Cir. 2009)).

10

412 U.S. 521, 528 (1973). Where the relationship is fixed by contract, the Supreme Court has applied a control test, incorporating the common-law distinction between contractors and employees or agents. Under the control test, the distinction between an employee and an independent contractor turns primarily upon the existence of federal authority to control and supervise the individual's "detailed physical performance" and "day to day operations." Wood, 671 F.2d at 829. Control over peripheral, administrative details, such as mandated compliance with federal standards and regulations, is not enough to make an individual an employee. Id. at 831-32; see also United States v. Orleans, 425 U.S. 807, 814 (1976). This does not mean, however, "that a physician must always be deemed an independent contractor simply because of the necessity that a physician exercise independent professional judgment in providing medical treatment to his or her patients." Robb, 80F.3d at 889. Control over the primary activity contracted for, although the most critical factor, is not necessarily the only factor. The Fourth Circuit has considered other potentially relevant indicia of control, such as how the individual was paid or what the parties intended, in order to distill application of the control test in the physician context. Id.[13]

---

[13] In Robb, the court held that the physicians were independent contractors and considered:
> (1) that the physician under the contract was referred to as a "contract physician," (2) that the physician was to provide "outpatient" care, (3) general statements concerning the manner and quality of service required under the contract, (4) the lack of control by the government over the prescription of drugs and medical supplies, (5) the authority of the physician to make referrals, (6) contractual requirements for office hours and the ability of the physician to decline to see patients, (7) the physician's responsibility to provide office space, support staff, supplies, and equipment, (8) the percentage of the physician's total practice which was devoted to activities under the contract, (9) the nature of the compensation to the physician, including method (fee schedule) and rates (similar to the physician's usual fees), (10) [the alleged employer's]

11

In light of this framework, the court examines the relationship between the VAMC and Dr. Medina and concludes that Dr. Medina was an independent contractor. The VAMC contracted with CompHealth for CompHealth to provide the services of physicians, such as Dr. Medina, to help staff its hospital. The VAMC had no contract with Dr. Medina and did not pay him. Dr. Medina contracted with CompHealth alone. Both the Medina-CompHealth and VAMC-CompHealth contracts expressly provided that Dr. Medina was an independent contractor, and he acted accordingly by exercising sole discretion over his medical judgment. The Medina-CompHealth contract also did not prevent Dr. Medina from working for facilities unrelated to the VAMC and specifically allowed him to delegate his responsibilities under his contract with CompHealth to another competent physician.

In addition, CompHealth did not pay Dr. Medina a salary but rather paid him for work he actually performed. He received no federal employee benefits. CompHealth, not the VAMC, paid his medical malpractice insurance. And the VAMC withheld no taxes as it would have had it considered him to be an employee. In sum, the relationship between Dr. Medina and the VAMC lacked the hallmarks of an employment relationship.

Faris' estate argues that Dr. Medina was a VAMC employee because the VAMC controlled his work schedule and patients; required him to be on-call; and provided him with

---

recordkeeping requirements, (11) prescribed methods of verifying patient eligibility for treatment, and (12) the extent of [the alleged employer's] review of the physician's offices.

Robb, 80 F.3d at 889 (citing Wood, 671 F.2d. at 830 & n. 10). Using similar analysis, numerous courts have held that physicians providing medical services at federal facilities are independent contractors. See, e.g., Carrillo v. United States, 5 F.3d 1302, 1305 (9th Cir. 1993); Broussard v. United States, 989 F.2d 171, 178 (5th Cir. 1993); Leone v. United States, 910 F.2d 46, 51 (2d Cir. 1990); see also Cilecek v. Inova Health Sys. Servs., 115 F.3d 256 (4th Cir. 1997) (in the Title VII context).

assistants, an office, and equipment.[14] This argument, however, mischaracterizes or views the actual relationship myopically. Once again, there was no agreement between VAMC and CompHealth's contract physicians. Rather, there was an agreement between CompHealth and VAMC to supply VAMC with certain medical personnel (having the requisite expertise and credentials) on schedules (and on call in the event of emergencies) to meet VAMC's needs. VAMC had no hold on Dr. Medina's time and schedule. He, or an appropriately credentialed physician, performed services CompHealth agreed to provide. Medina's compliance with the specifications of his contract to provide professional services is in no way the kind of meaningful control that is indicative of an employer-employee relationship. Nor, contextually, is the provision of assistants, an office, and equipment of any meaningful consequence. Cilecek, 115 F.3d at 262. (Use of the hospital's instruments and other resources is "inherent in the provision of [] medical services and likewise is not a reliable indicator of employee status [because] . . . he must, in almost every case, use . . . facilities provided by the hospital in order to render his services.")

Faris' estate also argues that the VAMC required compliance with hospital regulations and protocols and could terminate the relationship for failure to comply. But, as the Tenth Circuit has noted, "[s]urely, being subject to [a] hospital's rules as a condition of staff privileges does *not* remotely make a private physician an employee of that hospital." Lilly v. Fieldstone, 876 F.2d 857, 860 (10th Cir. 1989) (concluding that physician was an independent contractor); see also Orleans, 425 U.S. at 815 ("[T]he question here is not whether the [alleged government

---

[14] Faris' estate adds that the duration of the relationship was two years. However, Dr. Medina worked on short-term contracts with CompHealth, the first being from January 26, 2000 to January 31, 2001, and was under no obligation to continue working for CompHealth or the VAMC. As noted previously, he maintained authority to delegate his responsibilities under the contract at any time with the consent of CompHealth and the VAMC.

13

employee] receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government."); Robb, 80 F.3d at 888.

Therefore, the court finds that core aspects of an employer-employee relationship were simply absent in Dr. Medina's relationship with the VMAC. The VAMC controlled little more than "the peripheral, administrative details which were incident to the rendering of [Dr. Medina's] medical services." Robb, 80 F.3d at 888-91 (quoting from Wood, 671 F.2d at 831). Accordingly, the court has no jurisdiction under the FTCA for claims arising out of Dr. Medina's alleged negligence.

V.

For the reasons stated, the court denies the Government's motion to dismiss the action on timeliness grounds but grants its motion to dismiss claims arising from the acts of Dr. Medina, because the court finds that Dr. Medina was an independent contractor.

**ENTER**: March 5, 2014.

UNITED STATES DISTRICT JUDGE